THE STATE, EX REL. STULBARG ET AL., *v.* LEIGHTON, COMMR., ET AL.[*]

(No. 8647—Decided August 3, 1959.)

*Mr. George W. Weber, Jr.,* and *Mr. Jack B. Josselson,* for relators.

*Mr. William A. McClain* and *Mr. Walter P. Beck,* for respondents.

LONG, J. This is an action originating in this court, wherein relators seek a writ of mandamus against respondent, requiring him to issue a building permit for the erection of a trucking terminal.

---

[*]Appeal dismissed on application of appellants, moot question, October 7, 1959.

Certain objections were made to evidence which was taken by deposition, and also to the admission of certain ordinances. The court overrules the objections and also overrules respondents' motion for judgment on the pleadings.

Coming now to the merits of the case, the evidence discloses that the relators purchased some three acres of land on Springlawn Avenue, in the city of Cincinnati, and that the tract at the time of purchase was zoned industrial A, which permitted the construction and operation of a truck terminal; that sometime in January 1959, relators entered into an agreement to build and lease the truck terminal contemplated on one and one-half acres of the tract, at an annual rental of $14,400, for a period of ten years; that the lessee paid one-half year's rental of $7,200 as advance rent for the first year; that, in negotiating the lease with the Point Express, Inc., lessee, relators paid a real estate commission of $5,500 to the realtors Theodore Mayer & Brother; that on April 6, 1959, relators made an application for a permit for the construction of the proposed trucking terminal; that the permit was issued, requiring, however, that the sewer tap be made permanent; that three days later, a plumber, hired by the relators, secured a permit from the city of Cincinnati to tap the sewer; and that, on May 1, 1959, the sewer tap was inspected and approved by the city. This plumbing job cost relators the sum of $2,085.

The next thing which occurred was a discussion between the relators and the city sewer department. It seems that the creek which ran through the tract of land had to be relocated. In conformity with explicit directions by city officials, relators made arrangements to take care of the creek according to plans prepared by the city. Clearing of the woods was made by relators, and the Connelly Construction Company graded, excavated, moved the creek, and did extensive cement work preparatory to the erection of the building, all at an expense to the relators in the amount of $18,854. In addition to this expense, relators have contracted to pay $8,200 for the construction of a prefabricated dock, which dock has already been completed. Erection of the building itself has already been made an obligation of the relators in the sum of $3,000. Another contract exists for concrete work in the sum of $9,135, for which relators are liable.

Altogether, for monies expended and contracts to be completed, the sum of $190,774 is involved.

Thereafter, on April 29, 1959, the council of the city of Cincinnati, at its regular meeting, heard complaints of many of the people living in the neighborhood as to relators' occupancy and proposed use of their property. No notice of any hearing or receipt of complaints, with reference to the contemplated use, was listed on the calendar of council.

Whether they were entitled to notice or not, relators were not present to advise council of their obligations in connection with the establishment of their trucking enterprise. In any event, council, by a vote of seven to one, suspended the rules and passed the following ordinance:

"Ordinance No. 123-1959:

"Section 1. That the Building Code is hereby supplemented by ordaining Section 1423 to read as follows:

"Sec. 1423. It is hereby found and determined that the construction of truck terminals and truck loading, repair, storage and service facilities, except when incidental to some other permitted principal use, on premises abutting only on a local residential street is hereby declared to be a public nuisance detrimental to the public welfare.

"The construction of new truck terminals and new truck loading, repair, storage and service facilities, except where incidental to some other permitted principal use, is hereby prohibited on premises which do not abut a street which furnishes the principal means of ingress and egress to the premises which is a state route or has been designated a truck route pursuant to Section 503-18 of the Code of Ordinances.

"For the purpose of this section the term 'truck' shall mean any truck which, when empty, weighs more than 10,000 pounds or which has more than three axles, including the case of tractor-trailers axles on both tractor and trailer."

If this ordinance stands, have we arrived at the point where, by legislative fiat, under the guise of traffic control, a man can be told where his business must be located—banks on Fourth Street; theatres on Walnut Street? The city solicitor urges that the ordinance does not involve zoning, but is merely an exercise of the police power "to regulate any activity *which might*

*become* a public nuisance." A "run" on a bank, or a crowd in front of a theatre *might* be a nuisance. By way of analogy, and for the purpose of showing legislative intent by indirection, and more particularly under the circumstances of this case, we can see many things wrong with this pseudo zoning ordinance. Whether these faults are fatal or not is beside the point. We shall mention only some of them in passing.

We do not mean to say that you can not have zoning on one side of a street for purposes different from those prevailing on the other side. However, there must be some respect for the equitable application of the law to everybody in the community, as well as respect for due process. To illustrate, let us consider a presently annoying situation which we encounter on our way home from labor. It is an established fact that a great deal of parking occurs between the hours of four and six p. m. Signs are posted by the city prohibiting the parking of automobiles during these hours on the outgoing sides of the streets. Notwithstanding these signs, violations disturb the homeward-bound traffic. Suppose a man owned a lot in a business zone on an outbound side of the street and had obtained a permit from the city to construct a building particularly suited for no other operation than a grocery. Let us assume further that the grocer, relying upon the permit, spent substantial sums of money constructing the grocery store and had engaged in contracts involving large sums of money for furnishing the building. Can the city, by ordinance of any kind, prohibit the finishing of the building and the conduct of a grocery business therein by limiting the establishment of groceries to the inbound sides of streets? Indirectly, such an ordinance would eliminate a traffic hazard. Is this the method for dealing with traffic hazards? Does general welfare go so far?

As Judge Peck stated in the *Killeen case* (hereinafter cited), traffic regulations are a product of zoning; and if land is located in a zone where the contemplated user is legal, the public authorities must find some other method of dealing with the traffic hazards than curtailing the use of the land.

As the years go by, we see legislative bodies pass, and some courts approve under the guise of general welfare, rules of every description, attempting to control the conduct of our citi-

zens. We witness regulation upon regulation. Are we coming to the point where there is no activity of human existence remaining, where an individual is left to his own bent? Is there anything a man does that may not affect the general welfare? Was this the concept of the founding fathers? Where do we stop! Oh, General Welfare! What sins have been committed in thy name!

Another fault, what right has council to declare in advance of the operation of the business, that the mere construction of a truck terminal is a public nuisance? Equity will not so decree. And yet the same nuisance is allowed as an incident to some other "permitted" use. And what is a "residential street?" In the same neighborhood, where relators are barred, the street abounds with truck terminals. The city solicitor contends that the ordinance is nothing more than a regulation of the use of the streets; that we must consider the effect, as a whole, of the purpose of the ordinance. Notwithstanding the fact that council labels it a modification of the building code, this is a zoning ordinance. It clearly attempts to confine the location of a certain kind of business to certain streets. This is the very function and basis of zoning. This is the theory upon which zoning has been approved by the courts.

It is interesting to note that two days before this ordinance was passed, the city planning commission voted to return the ordinance to council and referred to it as an "emergency ordinance to amend the *zoning ordinance* to prohibit construction of truck terminals."

Aside from the faults of the ordinance, it is fundamental that a zoning law must find its justification in some aspect of the police power in the interest of the general welfare. As applied to the premises of the relators, its location is in a neighborhood abounding in other trucking terminals; and this terminal is proposed to be built in a location authorized by the previous zoning code. Therefore, what substantial relationship has the ordinance in question to the public health, morals or safety with reference to relators? If such a relationship does not exist, then so far as the premises of relators are concerned, the ordinance must fail as to them.

We must keep in mind that at the time of the purchase of

the land in question, the relators had the purpose of erecting and leasing a truck terminal in a part of the city where there were no restrictions by deed or *zoning*. As a matter of fact, at the time of the purchase, the building of a truck terminal was permitted in the industrial zone where the premises were located, and the respondent building commissioner, with the exception of the sewer tap, issued a permit, giving the relators the right to proceed with the plans, which had been submitted and approved by him.

It is true that this permit was temporary. However, this is the usual method of proceeding with the construction of buildings in Cincinnati. Feeling that they had the "go ahead signal," the relators then entered into contracts and paid for work on the premises, amounting to a sum in excess of $190,000.

In the opinion of the writer, the evidence shows such a substantial establishment and development of the property of the relators, prior to the enactment of the ordinance in question, as to come within the protection of the due process clauses of the federal and state Constitutions. The ordinance, as to relators, is retroactive and constitutes the taking of property without due process of law. Relators, under the circumstances of the case, should not be in any different position from the other truck terminal owners in the zoning area where relators' property is located. *Kessler* v. *Smith*, 104 Ohio App., 213.

Respondent's counsel argues that the permit issued by respondent contains a recitation that it is temporary and recites that its issuance in no event can cause any liability against the city, and that, therefore, relators have no rights or remedy. The fallacy of this reasoning is shown by the fact that in no event, and under no circumstances, would there be any "liability" against the city, in the true sense for anything which its officials did, except those expressly provided by law. In this connection, it is interesting to note that the testimony of the respondent Building Commissioner of the city of Cincinnati does not agree with his lawyers. At page 29 of his testimony, we find this by way of cross-examination:

"Q. Now, this temporary permit was given on the 6th of April, 1959. Would you tell us what is the purpose of this temporary permit? A. The purpose of this is to do a service to the

owner of the building when everything is in the clear, let him start operation.

"Q. And that's to enable him to get started with his operation, is that correct? A. Yes.

"Q. And to go ahead, as you say here, with the excavation and the footings and the foundation walls, is that correct? A. Yes.

"Q. So that he could immediately start to work? A. Yes, where everything has been covered previously that would be okay, we have checked."

And, on page 31 of the cross-examination of the respondent, is found the following:

"Q. Now, I will ask you, insofar as all the plans which were submitted and all the applications and so forth that Mr. Stulbarg had done, you would have issued the building permit if it had not been for the action of council on April the 29th in passing ordinance number 123-1959, is that correct? A. Yes."

The sole question in this case, whether you call the ordinance zoning or an amendment to the building code, is whether the ordinance, enacted as it is retroactively, is valid and constitutional as applied to relators. We must keep in mind that relators had expended very substantial sums of money in the purchase and development of their land prior to the enactment of the ordinance. It is fundamental that an ordinance of the kind in question cannot, under the pretext of police power, arbitrarily so restrict the use of property as to amount to confiscation. That would be the result, so far as the investment of relators is concerned, if this ordinance is sustained as to them. This is the view of the court in *State, ex rel. Weber,* v. *Vajner, Bldg. Commr.,* 92 Ohio App., 233. Notwithstanding council's declaration to the contrary, the construction, and even the operation of a truck terminal, is not a nuisance per se. The use of relators' property for such a purpose was lawful at the time of its purchase; the zoning ordinance applicable to relator's property said so. At that time there was no binding code regulation or other ordinances which denied such use.

In *City of Akron* v. *Chapman,* 160 Ohio St., 382, the court, in commenting on the limitation of use of property, said, at page 388: "The substantial value of property lies in its use. If the

right of use is denied, the value of the property is annihilated and ownership is rendered a barren right.'' To say, notwithstanding the fact that the relators will lose their entire investment, nevertheless, they can sell to some other industry, is no answer. What happened in council indicates that the ordinance was enacted in haste and primarily to prevent relators from completing and operating their trucking terminal. On its face, the ordinance was given the appearance of uniformity by including all trucking terminals in the future. This does not save the ordinance as being retroactive, discriminatory, and an unreasonable exercise of the police power so far as it applies to the land of relators. Any other action by council, under the circumstances, would have brought relators in the class of ''nonconforming users.'' It was only by passing the type of ordinance in question, that relators could be defeated.

We have been cited to the case of *State, ex rel. Ohio Hair Products Co.,* v. *Rendigs, Bldg. Commr.,* 98 Ohio St., 251, and similar cases. The *Hair Products case* can not be a solace to respondent. In that case, after the permit was issued, and after the ordinance revoking the permit was introduced in council, it was referred to a health committee of council; a public hearing was had; and the committee visited various places where the buying, selling, processing and manufacturing of the hair products of animals and packing house products were processed. The evidence was replete with the adverse effects on the health of the community caused by noxious odors, gases and volatile substances emited into the air by the operation of such a business. That is not the case at bar. It is readily apparent that the *Hair Products case* involves the health of the community and is not at all analogous to the facts in this case.

In *Smith* v. *Juillerat*, 161 Ohio St., 424, a strip-mining operation was forbidden by ordinance after a license had been issued. The facts in that case disclose that no actual or substantial construction for the strip-mining operation was even undertaken. Such preliminary work as testing had taken place, but no coal had been removed. The court held that in such a situation the coal operators had not brought themselves within the definition of ''nonconforming use'' and, therefore, no vested rights attached to defeat the prohibiting ordinance.

In the case of *Meuser* v. *Smith*, 74 Ohio Law Abs., 417, the Court of Appeals of the Second Appellate District, decided that:

"Where, prior to the enactment of a zoning ordinance, defendant acquires land, has plans and specifications prepared, secures the necessary permits, begins excavation preliminary to construction of a utility building, the construction of footer and the construction of a foundation to ground level, all looking to the completion and operation of a trailer camp [in this case $20,000 was expended], he has established a nonconforming use within the meaning of the zoning laws even though such trailer camp was neither completed nor in use at the time of the enactment of the zoning law in question."

The *Meuser* v. *Smith* case is on all fours with the case at bar, excepting that in the case at bar a great deal more money is involved. Does it make any difference whether you call the ordinance in question a zoning ordinance or an amendment to the building code? To use the city solicitor's expression, "You must consider the over-all effect of the ordinance."

We come now to the last expression of our Supreme Court on the subject in *State, ex rel. Killeen Realty Co.*, v. *City of East Cleveland*, 169 Ohio St., 375. In that case, the court held that "mandamus will lie to compel designated public officials to issue a building permit in accordance with the municipality's zoning ordinances." The court therein decided two points: First, that the zoning authorities are guilty of an abuse of discretion in not issuing, under the discretionary powers existing in the *present* zoning ordinance, the building permit sought. The second point is that refusal of council to amend the zoning ordinance to reclassify the property in question constitutes a taking of property without due process, resulting in its confiscation. The decision in the *Killeen case* is unanimous. In its opinion, the court quoted from the case of *Chicago Title & Trust Co.* v. *Village of Franklin Park*, 4 Ill. (2d), 304, 122 N. E. (2d), 804, as follows:

"* * * We here * * * reach the same conclusion that the trial court was correct in its determination that the property in question is wholly unsuited for residential purposes, that to solely restrict its use has the effect of destroying substantial

values, that such ordinance bears no relation to public health, safety, morals or general welfare and is therefore unconstitutional, illegal and void."

We have commented on some of the faults of the ordinance in question. Whether they are fatal, as previously stated, it is not necessary to decide at this time. We have concluded that under the circumstances of this case, as applied to the relators' property, the ordinance in question is in contravention of constitutional rights under Sections 1, 16, and 19 of Article I of the Ohio Constitution and the 14th Amendment to the Constitution of the United States.

The writ of mandamus, requiring respondent to issue a permit to relators, will be issued as prayed for.

*Writ allowed.*

O'CONNELL, J., concurs.
MATTHEWS, P. J., concurs in the judgment.