ELBERT et al., Appellees; Dargusch, Appellant,

v.

BEXLEY PLANNING COMMISSION et al., Appellees.

[Cite as *Elbert v. Bexley Planning Comm.* (1995), 108 Ohio App.3d 59.]

Court of Appeals of Ohio,
Tenth District.

Nos. 95APE04–451 through 454 and 95APE04–551.

Decided Nov. 2, 1995.

*Brunner & Brunner, Jennifer L. Brunner* and *Rick L. Brunner,* for Anita Dawson, Steven M. Elbert and Gloria Harris.

*William Goldberger, pro se.*

*Vorys, Sater, Seymour & Pease, William G. Porter II* and *Philip F. Downey,* for Bexley Board of Zoning Appeals, Bexley Environmental Review Board and Bexley Zoning Officer, Dorothy Pritchard.

*Chester, Willcox & Saxbe* and *Stephen C. Fitch,* for William G. Dargusch.

*William F. Underwood,* for *amicus curiae* city of Reynoldsburg.

*Thomas L. Weber,* for *amicus curiae* city of Gahanna.

*Dennis J. Fennessey,* for *amicus curiae* city of Whitehall.

*Baker & Hostetler* and *Michael E. Minister,* for *amicus curiae* city of Worthington.

*Charles A. Schneider,* for *amicus curiae* city of Hilliard.

---

DESHLER, Judge.

This case involves appeals by the city of Bexley Board of Zoning Appeals ("BZA"), the city of Bexley Environmental Review Board ("ERB"), Bexley Zoning Officer, Dorothy Pritchard, and William D. Dargusch (collectively, "appellants") from a judgment of the Franklin County Court of Common Pleas, reversing a decision of the BZA granting a request for variances and reversing a decision of the ERB approving site plans and specifications for a proposed restaurant.

This action arose out of the efforts of Dargusch, a developer, to seek approval from the city of Bexley to build a McDonald's restaurant on property located at 2484 East Main Street, Bexley. The property is zoned as part of the city's "Community Commercial District." Currently, the property is the site of a vacant establishment, the Bexley Art Theater, a former adult movie theater and adult video outlet.

The property is located on the north side of Main Street. The proposed plans provide for the building to be set off to the west side of the lot, with an outdoor cafe to be located at the south side of the building. The plans further provide for twenty-four off-street parking spaces for patrons.

As part of the application process, Dargusch sought a determination whether the proposed facility was a permitted use in the city's Community Commercial District. In application No. 829, the city zoning officer determined that the proposed McDonald's was an "eating place," thus qualifying as a permitted use pursuant to Bexley City Ordinance ("B.C.O.") 1252.03(j). The BZA subsequently voted to affirm the zoning officer's decision and interpretation that the proposed McDonald's constituted a permitted use.

On July 11, 1994, Dargusch filed an application with the Bexley Planning Commission for environmental approval of the site plans and for approval of a signage variance. On July 25, 1994, the planning commission, sitting as the ERB, held a meeting to consider the application, assigned as application No. 400. At the conclusion of the meeting, the ERB voted in favor of a motion for environmental approval of the site plan subject to the submittal of an ingress/egress plan acceptable to the city traffic engineer. The ERB also voted in favor of a motion to approve the signage application and variance, subject to certain conditions.

The ERB conducted a meeting on September 26, 1994 to take up further consideration of the issues pending in application No. 400. The ERB noted that the applicant, subsequent to the July 25, 1994 meeting, had submitted plans and documents addressing some of the concerns raised at that meeting, including a change to a single curb cut exit from the originally proposed combined driveway curb cut. A drawing was submitted, which had not been presented at the July 25 meeting, in response to concerns regarding traffic flow on Main Street. Based upon a review of the drawings submitted, including the changes made since the prior meeting, the ERB determined that the requirements of B.C.O. 1222.03(b) had been met. Pursuant to B.C.O. 1222.04(a), the ERB granted approval of the proposed plans.

Dargusch further sought approval by the BZA of the following three variances: (1) a variance from B.C.O. 1256.06, which requires one off-street loading space to be provided for buildings under 5,000 square feet; (2) a variance from B.C.O. 1256.04, which prohibits parking spaces in front of the principal building, in order to allow one foot, eight inches of one parking space to be located in front of the principal building; and (3) a variance from B.C.O. 1260.07(e), which requires accessory uses to be at least three feet from all property lines, in order to permit parking spaces to be located on the real property line and parking spaces and trash enclosure to be located one foot from the side property line on the east. On September 21, 1994, the BZA met to consider the matter. Following the hearing, the BZA voted to approve the granting of the three requested variances.

On November 14, 1994, appellees, Steven M. Elbert, Anita C. Dawson, Gloria Harris and William Goldberger, filed notices of appeal with the Franklin County Court of Common Pleas from the following actions: the order of the BZA granting three variances to appellant Dargusch (case No. 94CVH–11–8032, hereafter "case No. 8032"); the order of the BZA finding that the proposed restaurant was a permitted use in the Community Commercial District (case No. 94CVH–11–8033, hereafter "case No. 8033"), and orders of the planning commission, sitting as the ERB, approving plans and specifications for the proposed restaurant (case No. 94CVH–11–8034, hereafter "case No. 8034").

By entry filed November 23, 1993, the trial court granted a motion by Dargusch to intervene pursuant to Civ.R. 24(A). On December 12, 1994, appellees filed a motion to supplement the record in case Nos. 8032 and 8034. Specifically, appellees sought to present additional evidence regarding the issue of the impact of the proposed facility on traffic and pedestrian walkways in the area. By judgment entry filed January 10, 1995, the trial court sustained appellees' motion. On January 27, 1995, the trial court heard the testimony of two witnesses for appellees, Joseph Ridgeway and Leonard Kutney.

On April 7, 1995, the trial court rendered its decision in the matter. Specifically, in case No. 8033, the trial court affirmed the BZA's determination that the proposed facility was a permitted use. In case No. 8032, the trial court reversed the BZA's decisions to grant Dargusch's requests for variances, while in case No. 8034, the trial court affirmed in part and reversed in part the ERB's decision approving plans and specifications for the proposed McDonald's.

On appeal, the BZA, the ERB, and Pritchard (collectively, "the city") assert the following four assignments of error:

"Assignment of Error No. 1

"The trial court erred in overruling appellees-appellants', the city of Bexley and Dargusch, objections and motions in limine to exclude evidence regarding traffic regulation and in permitting the records in case Nos. 8032 and 8034 to be supplemented with testimony and evidence offered by appellants-appellees regarding traffic in connection with the trial court's review of the decision of the Bexley Board of Zoning Appeals to grant area (non-use) variances to appellee-appellant Dargusch and the decision of the Bexley Environmental Review Board approving plans and specifications for the proposed restaurant.

"Assignment of Error No. 2

"The trial court erred by failing to apply the deferential standard of review to the decisions of the Bexley Board of Zoning Appeals and the Bexley Environmental Review Board, by blatantly substituting its judgment for the judgment of Bexley's zoning officials and by judicially rewriting Bexley's zoning ordinances in a manner contrary to law and contrary to Bexley's consistent interpretation and administration of its zoning code.

"Assignment of Error No. 3

"The trial court erred in reversing the Bexley Board of Zoning Appeals decision to grant the three area (non-use) variances requested by appellant Dargusch.

"Assignment of Error No. 4

"The trial court erred in reversing the Bexley Environmental Review Board's approval of the site plans and specifications for the proposed restaurant."

Appellant Dargusch sets forth the following five assignments of error for review:

"Assignment of Error No. 1

"The trial court erred in (a) granting Appellees' motion to supplement the record in Case Nos. 8032 and 8034 with traffic evidence; and (b) overruling the City of Bexley's and Appellant William D. Dargusch's (Dargusch) motion in limine and objections to evidence regarding traffic in connection with the trial court's review of the decisions of the Bexley Board of Zoning Appeals (BZA) to grant variances to Appellant Dargusch and the Bexley Environmental Review Board (ERB) to approve plans and specifications submitted by Dargusch.

"Assignment of Error No. 2

"The trial court erred in (a) finding that the traffic testimony was reliable and credible; (b) finding that the variances approved by the Bexley BZA will increase traffic congestion; and (c) finding that the evidence of traffic congestion required reversal of the Bexley ERB's approval of Dargusch's plans and specifications.

"Assignment of Error No. 3

"The trial court erred in reversing the decision of the Bexley BZA to grant two area variances to Dargusch.

"Assignment of Error No. 4

"The trial court erred in reversing the decision of the Bexley ERB to approve the plans and specifications submitted by Dargusch.

"Assignment of Error No. 5

"The trial court erred in interpreting and applying BCO Chapters 1222 and 1256 in such a way as to deprive Dargusch of due process guaranteed by the Ohio and U.S. Constitutions."

William Goldberger, an appellee in case Nos. 8032 and 8034, has filed a notice of appeal from the trial court's entry only as it relates to the disposition of case No. 8033, in which the court affirmed the BZA's determination that the proposed restaurant was a permitted use.[1] Goldberger asserts the following assignment of error for review:

---

1. As noted above, William Goldberger has filed a notice of appeal only as to the trial court's decision in case No. 8033. In this court's discussion of case Nos. 8032 and 8034, Goldberger, along with Steven M. Elbert, Anita C. Dawson and Gloria Harris, will be referred to collectively as appellees.

"The Court of Common Pleas erred in affirming the determination of the Bexley Board of Zoning Appeals that the proposed McDonald's restaurant at 2484 East Main Street in Bexley is a 'permitted use' in accord with the Bexley Codified Ordinances."

Initially, we note the standards of review by which a trial court and an appellate court are to consider appeals under R.C. Chapter 2506. In *Budd Co. v. Mercer* (1984), 14 Ohio App.3d 269, 14 OBR 298, 471 N.E.2d 151, the court discussed the applicable standards of review, holding:

"It must * * * be remembered that the appeal in the common pleas court was an appeal from an administrative agency and, as such, was governed by R.C. Chapter 2506. * * * Specifically, the common pleas court is confined to the transcript compiled during the agency's proceedings (R.C. 2506.03, 2506.02), unless one of the conditions specified in the statute appears on the face of the transcript or by affidavit. R.C. 2506.03(A) and (B). * * * When reviewing the decision of an administrative agency, the common pleas court, based on the entire record, may find that the agency's order, adjudication or decision is 'unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable and probative evidence * * *.' R.C. 2506.04. In undertaking this hybrid form of review, the common pleas court must give due deference to the administrative agency's resolution of evidentiary conflicts, * * * and the court may not, especially in the areas of administrative expertise, blatantly substitute its judgment for that of the agency. * * *

" * * * *

"The key term in R.C. 2506.04 is 'preponderance.' * * * 'If a preponderance of reliable, probative and substantial evidence exists, the Court of Common Pleas must affirm the agency decision.' * * * In determining whether the common pleas court properly applied the standard of review set forth in R.C. 2506.04, this court has a limited function. This court's determination is limited to the question of whether, as a matter of law, a preponderance of reliable, probative and substantial evidence exists to support the decision of the board." *Id.* at 273–274, 14 OBR at 303–303, 471 N.E.2d at 156.

We will first address the single assignment of error of Goldberger. Under this assignment of error, Goldberger asserts that the trial court erred in affirming the BZA's determination that the proposed restaurant is a permitted use in the Community Commercial District of the city.

The issue of whether the proposed McDonald's restaurant is a permitted use is governed by the Bexley zoning ordinance. Pursuant to B.C.O. 1268.24, a "permitted use" is defined as "a use specifically allowed within a zoning district." B.C.O. 1252.03(j) provides that permitted uses in the Community Commercial

District include "[r]etail sales to include * * * food" and "[r]etail services to include * * * eating places."

In the present case, the trial court held that the BZA's determination that the proposed McDonald's restaurant is a permitted use was supported by a preponderance of reliable, probative and substantial evidence. We agree. The statutory language at issue is clear and unambiguous, and provides that an eating place is a permitted use in the Community Commercial District.

Notwithstanding the clear and unequivocal language of the ordinance, Goldberger contends that the proposed restaurant does not satisfy the statement of intent set forth in B.C.O. 1244.11. Goldberger further argues that the proposed restaurant falls under the definition of a "drive-in facility," thus constituting a specifically prohibited use in the Community Commercial District. Both of these contentions are without merit.

B.C.O. 1244.11 states:

"The purpose of this [Community Commercial] District is to allow and encourage a strong local shopping center in the City. A broad range of commercial uses should be allowed, but especially those which attract leisurely comparison-type shopping rather than a convenient quick-stop service. Development standards should allow a maximum use of a limited space for both shopping and parking, while preserving and enhancing pedestrian walkways. Redevelopment should be encouraged to use the Planned Unit Commercial District, when appropriate."

In response to Goldberger's contention that the proposed McDonald's constitutes a "convenient quick-stop" service, the trial court held that the language of B.C.O. 1244.11 "is permissive and serves as a guide" to the BZA. The court further noted that the language of the ordinance does not specifically prohibit "convenient quick-stop services," nor does it define that term. We find that the trial court properly concluded that the intent clause relied upon by Goldberger, while serving as a guide, cannot be construed as a prohibition upon language defining permitted uses.

In so holding, the trial court followed well-established Ohio case law which provides that "[s]tatutes or ordinances of a penal nature, * * * or which impose restrictions upon the use * * * of private property, will be strictly construed and their scope cannot be extended to include limitations not therein clearly prescribed." *State ex rel. Moore Oil Co. v. Dauben* (1919), 99 Ohio St. 406, 124 N.E. 232, paragraph one of the syllabus; see, also, *State ex rel. Spiccia v. Abate* (1965), 2 Ohio St.2d 129, 130, 31 O.O.2d 228, 228–229, 207 N.E.2d 234, 236, overruled on other grounds, 7 Ohio St.2d 85, 36 O.O.2d 75, 218 N.E.2d 428; *In re Univ. Circle, Inc.* (1978), 56 Ohio St.2d 180, 184, 10 O.O.3d 346, 348–349, 383 N.E.2d 139, 141–142; *Lykins v. Dayton Motorcycle Club* (1972), 33 Ohio App.2d 269, 62 O.O.2d

382, 294 N.E.2d 227; *Whiteco Metrocom, Inc. v. Columbus* (1994), 94 Ohio App.3d 185, 190–191, 640 N.E.2d 563, 566–568 (statutes imposing restrictions on the use of private property must be strictly construed and all doubts resolved in favor of the free use of the property rather than in restricting such use). In the instant case, the language relied upon by Goldberger does not set forth a clearly prescribed limitation, and we decline to find such a limitation by implication.

Goldberger further contends that the proposed restaurant is a "drive-in facility" as defined under B.C.O. 1268.10. We find no merit to this contention.

Pursuant to B.C.O. 1268.10, a "drive-in facility" is defined as "any place or premises used for sale or services to persons remaining in their automobiles, including those establishments where customers may serve themselves and may consume the food or beverages in their automobiles." We note that it is undisputed that the proposed McDonald's does not include a drive-through window. Goldberger's argument, however, is premised upon his assertion that customers of the McDonald's may serve themselves and consume the food or beverages in their automobiles; thus, he contends, the McDonald's constitutes a drive-in facility.

During the BZA hearing conducted on October 23, 1994, city zoning officer Dorothy Pritchard testified that the BZA did not consider the proposed McDonald's to be a "drive-in facility" as that term is defined under the ordinance. Specifically, Pritchard stated:

"Historically we have interpreted this to be places such as a car hop, a drive-in bank or any facilities of that type. We have not interpreted that to mean any restaurant where people may consume their food or beverages in their automobile. That could happen at any restaurant within the community commercial zoning district.

"Certainly at Fourbakers or Grinders or Graeter's you take your ice cream to your car. We would also add car hops to what we would consider a drive-in facility where you are served in your automobile.

" * * *

"That is not the intent of a restaurant to eat your food in your automobile or it is not the intent of that eating place, which is a permitted use, to eat the food in your automobile. The city of Bexley has no regulations that say you cannot eat food in your automobile, just as you can take your Fourbakers doughnuts and eat it in your automobile or your Grinders sandwich and eat it in your automobile.

"I don't believe that is what the code is talking about when it says customary meaning. Drive-in has historically in our code been interpreted as a facility designed for an automobile to drive through and be served or receive service * * *."

Thus, according to the testimony of Pritchard, the BZA has historically interpreted the term "drive-in facility" to include only facilities in which services are provided to customers in their vehicles. By way of example, Pritchard noted that the proposed McDonald's contemplates services similar to those of other restaurants in the Community Commercial District, including Grinders, Fourbakers and Graeter's, even though food at those establishments could be obtained quickly and consumed off the premises or in the customer's car. Although not dispositive, we find the BZA's interpretation of the zoning ordinance to be reasonable and entitled to weight. Presumably, Goldberger's interpretation would mean that all of the above establishments would be in violation of the ordinance based upon the possibility that a patron might consume food in his or her vehicle. The trial court noted that the BZA's determination that the proposed restaurant is an "eating place," as opposed to a "drive-in facility," was in accordance with the BZA's "legal obligation to liberally construe restrictive zoning ordinances." We concur with the trial court on this point.

More significantly, the clear language of the ordinance defines a "drive-in facility" as a "place or premises used for sale or services to persons remaining in their automobiles." The evidence in this case indicates that patrons must enter the restaurant to purchase their food and that indoor seating will be provided. Further, there will be no walk-up windows and no drive-through windows, nor will there be car-hop service. Accordingly, Goldberger's assertion that the proposed restaurant falls under the zoning code's definition of a "drive-in facility" is not well taken.

Case law further supports the BZA's interpretation. In *Spiccia, supra,* 2 Ohio St.2d at 130, 31 O.O.2d at 228–229, 207 N.E.2d at 236, the Ohio Supreme Court held that a Dairy Queen–type restaurant, in which "all services to the purchasers are to take place inside the building, and where it is contemplated that much of the food will be eaten at tables provided for that purpose," was properly held to be a "restaurant" as opposed to a "drive-in restaurant," despite the fact that "much of the food may be carried to the parked cars and there eaten or carried out and eaten entirely off the premises."

Finally, Goldberger appears to raise a constitutional challenge to the Bexley Zoning Code. The record indicates, however, that Goldberger never raised this issue before the trial court. The trial court's decision specifically noted that the constitutionality of the ordinances was not raised, holding that "[w]hether the zoning ordinances contain sufficient criteria, standards and clarity to pass constitutional muster has not been posed as a question to this Court and therefore need not be considered or ruled upon." Having failed to raise the issue before the trial court, Goldberger has waived his right to raise it now. See, *e.g., Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 70 O.O.2d 123, 322 N.E.2d

629; *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.* (1995), 73 Ohio St.3d 590, 653 N.E.2d 646.

The single assignment of error of Goldberger is overruled.

The first four assignments of error of the city and the first four assignments of error of Dargusch are interrelated and will be considered together. These assignments of error involve the trial court's decisions in case Nos. 8032 and 8034, in which the trial court reversed decisions of the BZA and ERB granting Dargusch's request for variances and approving plans and specifications for the proposed restaurant.

As previously noted, in case No. 8032, the BZA rendered decisions granting Dargusch's requests for variances from the Bexley Zoning Code's requirement of one on-site loading space, pursuant to B.C.O. 1256.06, and from the requirement that no parking spaces be located in the front of the principal building pursuant to B.C.O. 1256.04(c).[2] The trial court, in reviewing the decisions of the BZA, held that "traffic impact evidence is relevant with respect to BCO Chapter 1256, Off–Street Parking and Loading Regulations, which is the chapter which governs the variances that were granted." The trial court concluded that the BZA erroneously failed to give proper consideration to traffic concerns, holding that "[g]iven the current volume of vehicular and pedestrian traffic in suburban areas such as Bexley, Ohio, it is difficult to conceive how the Bexley City government could ignore the impact of these two factors and remain in compliance with its own code." The court concluded that it could not affirm the BZA's decisions to grant the requested variances because the transcript of the proceedings before the BZA did not contain reliable, probative and substantial evidence to support its decisions.

The trial court then considered the issue of the variances based upon additional evidence heard before the court regarding traffic impact. Specifically, the court considered the testimony of two witnesses testifying on behalf of appellees, Joseph Ridgeway, the Bexley City Traffic Engineer, and Leonard Kutney, a traffic engineer, regarding the potential effect of the proposed restaurant on traffic generation and traffic patterns. The trial court found that these two witnesses were qualified to testify on the impact of the proposed McDonald's restaurant on traffic and the court further concluded that the experts' testimony was reliable and credible. Upon consideration of the additional evidence regarding traffic impact, the trial court reversed the decisions of the BZA to grant the

---

2. As noted above, Dargusch originally sought three variances, including a variance from B.C.O. 1260.07(e), which requires accessory uses to be at least three feet from all property lines. The record indicates that the request for a variance from B.C.O. 1260.07(e) is now moot based upon revised plans approved by the ERB on February 27, 1995.

variances, holding in part that "credible evidence shows that the variances will increase traffic congestion." Similarly, in case No. 8034, the trial court reversed in part the ERB's decision to grant approval of the plans and specifications based upon the court's determination that the ERB had failed to consider traffic and parking concerns.

Initially, appellants contend that the trial court erred in allowing appellees to present additional evidence regarding the issue of traffic impact. On December 12, 1994, appellees filed a motion to supplement the record in case Nos. 8032 and 8034. Specifically, appellees sought to supplement the record pursuant to R.C. 2506.03 on the grounds that (1) appellees, in proceedings before the BZA and ERB, were not permitted to present evidence as to public interest concerns regarding traffic to be generated by the proposed restaurant; (2) the testimony in the above proceedings was not given under oath; and (3) the board and the ERB failed to file conclusions of fact in support of their final orders. Both the city and Dargusch filed briefs in opposition to appellees' motion to supplement the record.

By decision and judgment entry filed January 10, 1995, the trial court granted appellees' motion to supplement the record. The trial court conducted a hearing on January 27, 1995 to hear additional evidence by Ridgeway and Kutney testifying on behalf of appellees.

R.C. 2506.03 provides:

"(A) The hearing of such appeal shall proceed as in the trial of a civil action, but the court shall be confined to the transcript as filed pursuant to section 2506.02 of the Revised Code unless it appears, on the face of that transcript or by affidavit filed by the appellant, that one of the following applies:

" * * *

"(2) The appellant was not permitted to appear and be heard in person, or by his attorney, in opposition to the final order, adjudication, or decision appealed from, and to do any of the following:

"(a) present his position, arguments, and contentions;

"(b) Offer and examine witnesses and present evidence in support;

"(c) Cross-examine witnesses purporting to refute his position, arguments, and contentions;

"(d) Offer evidence to refute evidence and testimony offered in opposition to his position, arguments, and contentions;

"(e) Proffer any such evidence into the record, if the admission of it is denied by the officer or body appealed from.

"(3) The testimony adduced was not given under oath;

" * * *

"(5) The officer or body failed to file with the transcript, conclusions of fact supporting the final order, adjudication, or decision appealed from."

In the instant case, the trial court granted appellees' request to present additional evidence based upon R.C. 2506.03(2), (3) and (5).

■■■ While judicial review in an R.C. Chapter 2506 administrative appeal is ordinarily confined to the transcript, additional evidence may be presented if a statutorily defined exception exists. *T.O.P. 1 Partners v. Stow* (1991), 73 Ohio App.3d 24, 26, 595 N.E.2d 1044, 1044–1045. In general, R.C. 2506.03 "contains a liberal provision for the introduction of new or additional evidence to be heard by a reviewing court." *In re Annexation of Certain Territory* (1992), 82 Ohio App.3d 377, 381, 612 N.E.2d 477, 480.

The record supports the trial court's findings that the testimony adduced was not given under oath and that neither the BZA nor the ERB filed findings of fact. Thus, there was a statutory basis for the trial court to hear additional evidence pursuant to R.C. 2506.03. However, we agree with appellants' contention that the evidence ultimately heard and considered by the trial court was not reliable.

As previously noted, appellees presented supplemental evidence before the trial court through the testimony of Joseph Ridgeway and Leonard Kutney. Ridgeway, the Traffic Engineer for the city of Bexley, attended the July 25, 1994 meeting of the ERB, during which he gave his opinion that a maximum of 1,500 cars were expected to visit the proposed restaurant per day. At the hearing before the trial court on the motion to supplement the record, Ridgeway testified that in order to arrive at that calculation, he relied upon a manual published by the Institute of Transportation Engineers, referred to as the ITE Trip Generation Manual ("ITE Manual").

On cross-examination, Ridgeway acknowledged that the opinion he provided at the July 25 meeting was based upon a "quick calculation." Ridgeway stated that his intent was to arrive at a maximum figure. He stated that the 1,500 figure was the "high end of the range," and that a "low end range" would be somewhere between 1,000 and 1,100 vehicles per day. Ridgeway further explained that a new facility has two types of traffic. The first type he referred to as "pass-by traffic," meaning traffic already on the street which enters the facility. The second type of traffic he termed "new traffic," defined as "traffic that is attracted to the site which is not normally on that roadway at that location." Regarding the new traffic to be generated by the restaurant, Ridgeway arrived at a high end figure of 900 vehicles per day. Ridgeway testified that the new traffic generated

by the proposed restaurant would increase overall traffic between four and five percent.

Ridgeway noted that the ITE Manual was an "informational report," and that the data is based upon a compilation of studies. The ITE Manual provides that "no attempt was made to conduct original field studies for this report" and that "information concerning the generator or site were obtained either through personal interviews, actual measurements, telephone conversations, or mail-back questionnaires." ITE Manual, at I–3. Ridgeway acknowledged that the ITE Manual contains cautions regarding the use of the data contained within. The ITE Manual cautions that a user should collect local data for comparison when considering use of the data in the report. Ridgeway testified that he did not attempt to collect local data, nor did he attempt to adjust his calculations based upon local factors as recommended by the ITE Manual.

Ridgeway indicated that the data base for the ITE Manual extends back to the early 1960s. He was aware that the ITE Manual urges that "[u]sers of this report should also exercise extreme caution when utilizing statistics that are developed from a small number of studies or when the data points are widely scattered." ITE Manual, at I–2. In the present case, Ridgeway relied upon a sample size of six studies. He further admitted that the data points he utilized to arrive at his calculation were widely scattered. Ridgeway was also questioned about his calculation of standard deviation, which, according to the ITE Manual, "is a measure of how widely dispersed the data points are around the calculated average; the less dispersion (the lower the number), the better." ITE Manual, at I–10. Ridgeway admitted that while some of the charts had standard deviation numbers for restaurants as low as 1.10 and 4.31, he relied upon a standard deviation number of 147.

During cross-examination, Ridgeway admitted that he could not give an opinion based upon a reasonable degree of scientific certainty regarding the number of vehicles that will be generated by the site. Specifically, Ridgeway was asked the following on cross-examination:

"Q. Mr. Ridgeway, given this kind of discrepancy on the drive-thru versus the non-drive-thru, given the small statistical sample that is six samples over a twenty-year period—we don't know if those included a McDonald's—given the high standard deviation rate that you have testified to now, do you believe that the study that you used, the one that appears on 1287, is sufficiently reliable for you to express an opinion to a reasonable degree of scientific certainty as to the number of vehicles that are going to be generated by this site?

"A. No, I do not.

"Q. If someone took your number and did no further study, just took your number that you gave the planning commission with no further adjustment or modification, would you believe that that person would be able to render a professional opinion to a reasonable degree of scientific certainty based upon your number without further study or modification?

"Ms. Brunner: Objection.

"The Court: Overruled.

"A. No, I would not."

Ridgeway further testified that "[t]here is absolutely no scientific certainty in this manual. If you get into probabilities, some of the factors may be accurate and some of them might not."

Ridgeway further acknowledged that he did not perform a traffic impact study. According to Ridgeway, a traffic impact study would have taken into consideration the amount of traffic a particular site would generate, including a "capacity analysis" to determine how much traffic the adjacent roadway network would handle and how much traffic the particular facility would add to the area. Ridgeway stated that "if you are doing an impact study, there are really a lot of other things that need to be taken into consideration here that haven't been in my analysis."

Appellees also presented the testimony of Leonard Kutney, a traffic engineer. Kutney's analysis of traffic impact was based upon the figure of 1,500 vehicles per day calculated by Ridgeway. Kutney acknowledged that he did not make any calculations of his own to determine the accuracy of the figure arrived at by Ridgeway.

In the present case, the trial court, in reversing the decisions of the BZA and ERB granting the requested variances and approving the plans and specifications, held in part that credible evidence had been admitted which proved that traffic congestion would be increased as a result of the restaurant. Upon review, we find that the testimony of appellees' experts was not grounded upon reliable evidence and thus should not have served as a basis for reversing the decisions of the BZA and ERB.

Evid.R. 702 provides that a witness may testify as an expert if the testimony "is based on reliable scientific, technical, or other specialized information." In *State v. Benner* (1988), 40 Ohio St.3d 301, 313, 533 N.E.2d 701, 714, the Ohio Supreme Court held that "[i]n this jurisdiction, an expert opinion is competent only if it is held to a reasonable degree of scientific certainty."

By appellees' expert's own admission, the underlying data contained in the ITE Manual were so inherently unreliable that he could not provide an opinion, to a

reasonable degree of certainty, regarding traffic volume to be generated by the proposed restaurant. Further, although Ridgeway testified on redirect that he believed there was some difference between a reasonable degree of scientific certainty and a reasonable degree of scientific probability, in terms of probability the most he could say was that "some of the factors may be accurate and some of them might not."

As noted above, the ITE Manual relied upon by Ridgeway as the basis for his estimate of traffic volume warned that local data should be collected for comparison when using the data. Ridgeway, however, did not collect local data. He further acknowledged that the sample size of the studies was small (a sample size of six over a twenty-year period) and that the standard deviation in the data was extremely high (one hundred forty-seven). He also failed to conduct a traffic impact study to determine how much traffic this particular facility would add to the area. Appellees' other witness, Kutney, performed no separate calculation of his own; rather, he acknowledged that he accepted Ridgeway's "quick calculation" and used it as the basis of his estimates regarding traffic impact. Thus, the testimony by Kutney regarding traffic impact, premised upon data used by Ridgeway, was also lacking in reliability and highly speculative at best. In sum, the facts and data serving as the basis for the experts' traffic calculations, and further relied upon by the trial court in concluding that the proposed restaurant would increase traffic congestion, were inherently untrustworthy and thus of no probative value. Accordingly, the trial court erred in relying upon the supplemental evidence as grounds for reversing the decisions of the BZA and ERB.

Even assuming that credible evidence had been presented regarding potential traffic impact, the emphasis placed by the trial court on such evidence was, as a matter of law, erroneous. In case No. 8034, the sole basis for the trial court's decision reversing in part the plans and specifications for the proposed restaurant was the court's finding that the ERB had failed to consider traffic impact evidence. Similarly, the trial court's decision reversing the BZA's grant of variances was predicated essentially upon the court's finding that traffic congestion would be increased as a result of the variances.

In *State ex rel. Killeen Realty Co. v. E. Cleveland* (1959), 169 Ohio St. 375, 386, 8 O.O.2d 409, 415, 160 N.E.2d 1, 8, the Ohio Supreme Court held:

"[T]raffic regulation must remain a byproduct of zoning activities, and the primary product must always be to insure the greatest enjoyment of one's land, taking into account the rights of others and the needs of the community. Thus, if the present proposal is otherwise lawful and proper, the public authorities must find some manner of dealing with the traffic hazards * * *."

The holding in *Killeen* has been applied by a number of Ohio appellate courts. See, *e.g., Pure Oil Div. v. Brook Park* (1971), 26 Ohio App.2d 153, 158, 55 O.O.2d 292, 295, 269 N.E.2d 853, 856 (where commercial property is located in area burdened by heavy traffic, problems of additional traffic hazards must be secondary to the right of a property owner to have use of his property in a manner consistent with its location); *State ex rel. Stulbarg v. Leighton* (1959), 113 Ohio App. 487, 490, 18 O.O.2d 94, 95–96, 173 N.E.2d 715, 716–717 (traffic regulations are a product of zoning and if land is located in zone where contemplated use is legal, public authorities must find some other method of dealing with traffic hazards than curtailing use of land); *Brockman v. Morr* (1960), 112 Ohio App. 445, 447, 16 O.O.2d 341, 342, 168 N.E.2d 892, 894–895 (Ohio law is well settled that traffic regulations are mere byproducts of zoning and public authorities may not adopt zoning changes to regulate traffic).

■ We make clear that we do not hold that traffic concerns could not have been considered as part of the review process. As will be discussed more fully below, the record indicates that the ERB did consider evidence regarding potential traffic problems and their resolution. The trial court, however, failed to give due deference to the considerations of the ERB regarding these concerns and instead gave overriding importance to the supplemental evidence of traffic impact. Clearly, any development of the site at issue will result in increased traffic in the area. However, evidence that a proposed facility will generate increased traffic is insufficient, standing alone, to justify the denial of an otherwise permitted use by a property owner. *Killeen, supra.*

■ Excluding the speculative evidence regarding traffic impact relied upon by the trial court, we now consider whether a preponderance of reliable, probative and substantial evidence exists to support the decisions of the BZA and the ERB in granting variances and approving plans and specifications for the proposed facility. We first address the decision of the BZA to grant the variances at issue.

B.C.O. 1264.14 empowers the BZA to grant variances under certain circumstances. 1264.14(b) provides:

"The Board of Zoning Appeals shall have the power to authorize variances from the provisions of this Zoning Code. A variance is a modification of the provisions of this Zoning Code where such modification will not be contrary to the public interest. In authorizing a variance, the Board may attach conditions and require such guarantee or bond as it may deem necessary to assure compliance with the objectives of this Zoning Code. Variances may be granted only where the following requirements are met:

"(1) Literal enforcement of this Zoning Code will result in an unnecessary hardship with respect to the property.

"(2) The unnecessary hardship is caused by unique characteristics of the property which are not applicable to other properties in the same district, and the unique characteristics do not result from the actions of the applicant.

"(3) The variance observes the intent of this Zoning Code, produces substantial justice and is not contrary to the public interest."

Pursuant to B.C.O. 1264.14, variances may be granted only upon a showing of "unnecessary hardship." In the instant case, however, the variances sought by the applicant are area variances as opposed to use variances. In *Kisil v. Sandusky* (1984), 12 Ohio St.3d 30, 12 OBR 26, 465 N.E.2d 848, the Ohio Supreme Court held in the syllabus:

"The standard for granting a variance which relates solely to area requirements should be a lesser standard than that applied to variances which relate to use. An application for an area variance need not establish unnecessary hardship; it is sufficient that the application show practical difficulties."

In adopting a lesser standard for granting an area variance as opposed to a use variance, the *Kisil* court relied in part upon the decision of the New York Court of Appeals in *Matter of Hoffman v. Harris* (1966), 17 N.Y.2d 138, 144, 269 N.Y.S.2d 119, 123–124, 216 N.E.2d 326, 329–330, in which that court explained the reason for distinctions between use and area variances: "When the variance is one of area only, there is no change in the character of the zoned district and the neighborhood considerations are not as strong as in a use variance." *Kisil, supra*, 12 Ohio St.3d at 32–33, 12 OBR at 28, 465 N.E.2d at 851.

In *Duncan v. Middlefield* (1986), 23 Ohio St.3d 83, 86, 23 OBR 212, 214–215, 491 N.E.2d 692, 695, the court expounded on the "practical difficulties" standard, and set forth certain factors to be considered in determining whether a property owner seeking an area variance has met that standard, holding:

"While existing definitions of 'practical difficulties' are often nebulous, it can safely be said that a property owner encounters 'practical difficulties' whenever an area zoning requirement (*e.g.*, frontage, setback, height) unreasonably deprives him of a permitted use of his property. The key to this standard is whether the area zoning requirement, as applied to the property owner in question, is reasonable. The practical difficulties standard differs from the unnecessary hardship standard normally applied in use variance cases, because no single factor controls in a determination of practical difficulties. A property owner is not denied the opportunity to establish practical difficulties, for example, simply because he purchased the property with knowledge of the zoning restrictions.

"The factors to be considered and weighted in determining whether a property owner seeking an area variance has encountered practical difficulties in the use of

his property include, but are not limited to: (1) whether the property in question will yield a reasonable return or whether there can be any beneficial use of the property without the variance; (2) whether the variance is substantial; (3) whether the essential character of the neighborhood would be substantially altered or whether adjoining properties would suffer a substantial detriment as a result of the variance; (4) whether the variance would adversely affect the delivery of governmental services (*e.g.,* water, sewer, garbage); (5) whether the property owner purchased the property with knowledge of the zoning restriction; (6) whether the property owner's predicament feasibly can be obviated through some method other than a variance; (7) whether the spirit and intent behind the zoning requirement would be observed and substantial justice done by granting the variance." (Citations omitted.)

The decision by the BZA to grant the variances was based upon evidence adduced at its September 21, 1994 meeting. At that meeting, the BZA heard from a number of individuals, including the developer and zoning officer Pritchard, regarding the variances sought. The BZA also saw plans, drawings and layouts of the proposed project.

As previously noted, one of the requested variances involves B.C.O. 1256.04, which prohibits parking spaces in front of the principal building. Regarding this variance request, Zoning Officer Pritchard stated that her research indicated that ten variances had been previously granted between 1972 and 1990 for parking in front of the principal building. In addition, a large number of parking lots in front of buildings exist as nonconforming uses. Pritchard also noted that, as to the proposed McDonald's, green space will buffer the front parking spaces from the sidewalk.

The other variance at issue involves B.C.O. 1256.06, which requires one off-street loading space for buildings under 5,000 square feet. Regarding the request to eliminate a loading space, Dargusch stated at the BZA meeting that deliveries should not pose a problem, as they would be made every four to five days, with unloading time taking between twenty-five to thirty-five minutes. Dargusch indicated that delivery trucks would use the lot approximately one percent of the time; thus, he preferred to seek additional parking spaces over a loading zone. Pritchard stated that this type of request had not often been made because few new buildings had been constructed in Bexley since the adoption of the zoning code. Pritchard researched other similarly situated businesses built since 1972 which have loading-space requirements. Pritchard stated that none of the thirteen businesses complies with the code, but that, except for one instance, there had been no complaints about the manner in which businesses were receiving their goods.

Upon review, the evidence in the record supports the BZA's determination granting the area variances. The variances sought are insubstantial, including one variance which seeks to extend one parking space twenty inches in front of the building. The evidence does not support a finding that the essential character of the neighborhood· would be altered or that adjoining properties would suffer as a result of the extension of one parking space twenty inches. Further, the evidence indicates that the city has not mandated literal compliance with loading-space requirements for other similarly situated businesses and that this policy has not resulted in a substantial detriment to adjoining property owners. There was no evidence that the delivery of governmental services would be affected by the variances.

We note that the trial court found that the variances were contrary to the intent of the zoning code based upon the court's finding that "the variances will increase traffic congestion." Assuming that traffic impact evidence was even relevant to the consideration of these area variances under the Bexley Zoning Code, we have previously concluded that the trial court's findings concerning potential increased traffic are not supported by credible evidence. The present site of the proposed restaurant is a vacant adult theater and adult video store with no off-street parking. As it presently stands, the building is an obsolete theater whose use, as intended, would require a number of variances, including a use variance and a variance from parking requirements. Zoning Officer Pritchard noted that, due to the narrowness of lots on Main Street, and the large number of nonconforming structures, few locations are able to provide the required number of off-street parking spaces. In the instant case, the evidence indicates that the requested variances would help maximize off-street parking and encourage local shopping. The evidence indicates that the variances are not contrary to the public interest or in conflict with the spirit and intent of the zoning ordinance and that substantial justice would be done by granting the variances. Finally, while the trial court found that Dargusch contracted to purchase the property with knowledge of the zoning restrictions, we note that this is just one factor to be weighed and considered, and it is insufficient, standing alone, to preclude a property owner from obtaining a variance. *Duncan, supra,* 23 Ohio St.3d at 86, 23 OBR at 214–215, 491 N.E.2d at 695–696 (a property owner is not denied the opportunity to establish practical difficulties simply because he purchased the property with knowledge of zoning restrictions).

In sum, the record indicates that the applicant demonstrated practical difficulties and that the BZA's decision to grant the requested variances was supported by a preponderance of reliable, probative and substantial evidence. Thus, the trial court erred in reversing the decision of the BZA.

■ We also find that the trial court erred in reversing in part the decision of the ERB regarding approval of the plans and specifications for the proposed restaurant based upon the court's finding that the ERB heard, but failed to consider, traffic evidence. While the trial court affirmed the decision of the ERB regarding the plans, drawings, lighting scheme, placement and appearance of an on-site trash enclosure, outdoor furniture and landscaping, the court further concluded that the ERB's decision approving the plans and specifications was not supported by a preponderance of reliable, probative and substantial evidence "[i]n light of the above procedure utilized by the ERB with respect to the traffic/parking/pedestrian evidence."

B.C.O. 1222.03(b) provides in part:

"*Regulations.* No building, structure or space within the Bexley Environmental Review District shall be constructed, reconstructed, altered, moved, extended, razed, enlarged or changed in external appearance unless and until the plans and specifications for such building or structure and the landscaping plan for the premises on which it is or will be located have been approved by the Board. The Board, in reviewing such plans and specifications, shall examine the architectural design, the exterior surface treatment and color, the arrangement of buildings and structures on the premises, the use of signage, the means of integrating parking, the use of landscape materials and the impact of the proposed project on the surrounding properties to determine the effect the project will have upon the appearance and environment of the District. The Board shall endeavor to assure that the exterior appearance and environment of such buildings, structures and spaces will enhance the attractiveness and desirability of the District in keeping with its purpose and intent, encourage the orderly and harmonious development of the District in keeping with the character of the District, improve residential amenities in any adjoining residential neighborhood and enhance and protect the public and private investment in the value of all land and improvements within the District and adjoining districts."

The trial court, in interpreting the ERB's role under B.C.O. 1222.03(b), held that "even though the ERB was responsible for examining 'the means of integrated parking,' and 'the effect the project will have upon the appearance and *environment* of the District,' the ERB heard, but would not consider, testimony on traffic/off-premises parking/pedestrian concerns." (Emphasis *sic.*) The trial court then held that the additional evidence admitted before the court regarding traffic impact precluded approval of the plans and specifications.

Traffic concerns were addressed at both the July 25, 1994 and September 26, 1994 meetings of the ERB. As previously noted, at the July 25 meeting, environmental approval of the site plan was submitted subject to the applicant's submittal of a traffic plan acceptable to the city traffic engineer. At the

subsequent meeting on September 26, the ERB again considered the issue of traffic. The minutes of that meeting provide:

"The ninth and final drawing, which was not submitted at the July 25, 1994 meeting, was drawn in response to concerns regarding traffic flow on Main Street. Mr. Helman asked if the City's Traffic Engineer had reviewed the drawing. Mrs. Pritchard stated that Mr. Ridgeway, the Traffic Engineer for Bexley, has reviewed and approved the current drawing with conditions. Mr. Helman asked for the conditions. Mrs. Pritchard read Mr. Ridgeway's letter, a copy of which is attached and made part of the record. Chairman Swedlow asked Mr. Dargusch if he was aware of the conditions made by Mr. Ridgeway. Mr. Dargusch stated that he has responded in writing to the conditions and has further agreed to their acceptance. Chairman Swedlow asked who pays the costs involved. Mrs. Pritchard stated that the costs are to be borne by the developer. Mr. Helman asked off of which signal the Woodworkers driveway will operate. Mr. Dargusch stated that the Woodworkers shop will not be using the signals. The traffic from the Woodworkers Shop will merge into traffic. The lights will be optically shielded from the view of traffic exiting the Woodworkers lot onto Main Street. Mr. Dargusch stated that there were a total of four traffic plans submitted to the owner of the Woodworkers Shop to choose from and he wished to remain a separate entity on Main Street. Mr. Helman noted the time schedule on the no turn sign on the drawing and asked to be sure that the Safety Engineer has seen and approved of the times noted.

" * * *

"Mr. Helman moved to adopt the following resolution:

"Based upon the Board's review of drawings 1 through 9 as submitted to the Board for their consideration at this meeting and any changes made to these drawings since their original consideration at the July 25, 1994 meeting, he moved that the Board find that the requirements of Bexley Code Section 1222.03(b) have been met and in accordance with Bexley Code Section 1222.04(a) that the Board reaffirms their approval of the plans and drawings as submitted. The conditions of the approval granted at the July 25, 1994 meeting remain as conditions of this approval and should the alley be made one way, the directional signs at the alley shall be removed. This approval is conditioned also on the acceptance of Bexley City Traffic Engineer, Joe Ridgeway's letter (attached) to the base approval, and that all required costs for said traffic improvements as recommended by our traffic engineer be borne by the applicant."

Thus, the record indicates that the ERB considered the issue of traffic and conditioned its approval upon the acceptance of a traffic plan proposed by the city traffic engineer. The record further indicates that the city traffic engineer made recommendations which the developer agreed in writing to implement. The trial

court, however, failed to give deference to the ERB's interpretation of the city's zoning ordinance. Rather, the trial court held that B.C.O. 1222.03(b) outlines the factors the ERB shall consider with "a broad brush," and that "the ERB approached its task from a much narrower perspective." In giving the city zoning code an expansive interpretation, the trial court improperly substituted its judgment for that of the ERB and engrafted a "traffic volume" requirement to the zoning ordinance, which is not part of the existing code. Further, the trial court's holding is tantamount to a finding that an increase in traffic alone is sufficient to justify precluding an otherwise valid use of property. As previously noted, however, such a ruling is not in accordance with law; nor was the supplemental traffic impact evidence reliable. Accordingly, the trial court erred in reversing in part the decision of the ERB granting approval of the plans and specifications for the site.

Based upon the foregoing, the first, second, third and fourth assignments of error of the city and the first, second, third and fourth assignments of error of Dargusch are sustained.

In light of our disposition of the previous assignments of error, Dargusch's fifth assignment of error, asserting an alleged violation of due process rights, is rendered moot.

Based upon the foregoing, the single assignment of error of Goldberger is overruled, the first, second, third and fourth assignments of error of the city are sustained, the first, second, third and fourth assignments of error of Dargusch are sustained and the fifth assignment of error of Dargusch is rendered moot. Accordingly, the judgment of the trial court is affirmed in part and reversed in part and this matter is remanded to the trial court with instructions to enter judgment affirming the decisions of the BZA and ERB in case Nos. 8032 and 8034.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded*
*with instructions.*

JOHN C. YOUNG and CLOSE, JJ., concur.